# Exhibit 34

```
                                                              Page 1
  1            IN THE UNITED STATES DISTRICT COURT

  2              FOR THE DISTRICT OF NEW JERSEY

  3    _____

  4    THE UNITED STATES OF          )

  5    AMERICA, ex rel. STEVE        )

  6    GREENFIELD,                   )

  7              Plaintiff,          )

  8        -vs-                      )   Docket No.

  9    MEDCO HEALTH SYSTEMS, INC.,   )   1:12-CV-522

 10    ACCREDO HEALTH GROUP, INC.,   )

 11    and HEMOPHILIA HEALTH         )

 12    SERVICES, INC.,               )

 13              Defendants.         )

 14    _____

 15               LATHAM & WATKINS LLP

 16                885 THIRD AVENUE

 17          NEW YORK, NEW YORK  10022-4834

 18             FRIDAY, MARCH 18, 2016

 19                   9:16 A.M.

 20

 21          VIDEOTAPED DEPOSITION OF

 22             KEVIN G. MCANANEY

 23    REPORTED BY:

 24    DEBRA SAPIO LYONS, RDR, CRR, CCR, CPE

 25    JOB NO. 63193
```

```
 1       Q.    Doesn't have anything to do with the
 2   Hemophilia Association of New Jersey; right?
 3       A.    No, it does not.  It's just another
 4   patient advocacy group.
 5       Q.    Did you conduct, as part of your
 6   methodology in this case, any kind of comparison of
 7   what the organization referred to in Advisory
 8   Opinion Number 99-10 -- how it compares with the
 9   Hemophilia Association of New Jersey?
10       A.    No, I did not.
11       Q.    Now, you indicated that in this case
12   you believe the Hemophilia Association recommended
13   certain home healthcare providers; is that right?
14       A.    That's correct.
15       Q.    Okay.  What specifically in the
16   factual record serves as the basis for your opinion
17   that the Hemophilia Association of New Jersey
18   recommended home healthcare providers?
19       A.    They have a list during this relevant
20   period.  They had a list of HSI approved
21   healthcare -- home care providers I believe they
22   were, and they disseminated that information.  It
23   was on their website.  It was fairly -- I mean it
24   got wide distribution among their membership.  They
25   occasionally sent out letters, incorporated it.
```

Page 135

1  I -- there are letters where they sent them to the
2  state HTCs.
3        Q.    Okay.  Other than the list of HSI
4  home healthcare providers, is there anything else
5  that you're referring to when you talk about the
6  Hemophilia Association of New Jersey recommending
7  home healthcare providers?
8        A.    I -- yes, they -- they -- there is at
9  least correspondence in, I think 2008 or something
10 when -- when -- no.  Well, yeah -- 2008 I believe
11 when somebody -- that they sent out brochures for a
12 company that they had just added to the list to --
13 it appears to their members, it was addressed to
14 their members.  They -- there's a correspondence I
15 believe even the -- the piece I -- the letter that I
16 showed you that I brought today informing people.  I
17 think that's -- and there's several -- there's
18 several other similar letters.  In addition, there
19 is correspondence when -- in an e-mail chain when
20 they're talking about BioScript that -- and there
21 had been a dispute with Aetna.  Aetna tried to use a
22 non-approved -- non-New Jersey-approved home care
23 company, that did not go, and they -- but one of the
24 home care companies Aetna could use was -- I think
25 it -- oh, I think it was BioScript; and, in fact, a

Page 143

```
 1        Q.    Okay.  How is this internal e-mail
 2   about BioScript and Aetna a recommendation of home
 3   healthcare companies?
 4              THE VIDEOGRAPHER:  Excuse me,
 5   counsel, your microphone.
 6              MR. BOEHM:  Thank you.
 7        A.    I think it is evidence of -- it is
 8   evidence of the steps they took to promote these
 9   companies.
10        Q.    In what way?
11        A.    Well, they contacted beneficiaries
12   and promoted one company; and -- and were
13   successful.
14        Q.    In this case they promoted BioScript,
15   is that what you're saying?
16        A.    Yes.
17        Q.    Are you aware of any correspondence
18   in the factual record or any document at all where
19   in your view HANJ is expressly recommending not
20   BioScript but Accredo to hemophilia patients in the
21   State of New Jersey?
22        A.    No, only an -- only evidence of a
23   non-recommendation.
24        Q.    What are you talking about?
25        A.    I'm talking about the -- the
```

Page 181

1  Q.  Why is that not fair?
2  A.  Because I think the record shows that
3  they did have influence and that's what I base my
4  -- that, and I think people would have thought they
5  did and I think the record shows that they did.
6  Q.  What specifically are you -- are you
7  relying upon in the factual record to conclude that
8  HANJ did have what you would call special influence
9  in the hemophilia community in New Jersey?
10  A.  Well, the fact that they -- they
11  credited themselves with switching the BioScript
12  patients at Aetna and they also obviously on several
13  occasions threatened Accredo with losing patients.
14  Q.  Anything else?
15  A.  No, I think that shows that they --
16  they had influence and they thought they had
17  influence.
18  Q.  Nothing else that you're pointing to
19  in the factual record; right?
20  A.  Well, and -- and -- and the letters
21  that came in subsequent to the 2011.
22  Q.  Have you conducted any type of
23  analysis to try and determine whether, in fact, HANJ
24  actually referred any particular patient to
25  Accredo's home healthcare services?

Page 182

```
 1         A.    No.
 2         Q.    You don't know whether that actually
 3   took place or not; correct?
 4         A.    I assume it didn't.
 5         Q.    Why do you assume that it didn't?
 6         A.    Well, I haven't seen any evidence
 7   that they referred specific patients.
 8         Q.    And you're not expressing the opinion
 9   that either you or anybody else could reasonably
10   conclude that HANJ referred specific patients to
11   Accredo services based on this factual record;
12   correct?
13         A.    Not that I'm aware of, no.
14         Q.    Have you made any effort to determine
15   what hemophilia patients in the State of New Jersey
16   would have understood about the nature of the list
17   of home care companies on the website?
18               MS. POSERINA:  Objection to form.
19         A.    No, I have not.
20         Q.    So as you sit here today, you cannot
21   reasonably offer any opinion about what the actual
22   hemophilia patients in New Jersey would have took
23   from the information provided by HANJ on its website
24   with respect to home healthcare companies; correct?
25               MS. POSERINA:  Objection to form.
```

Page 191

1   So I think they did have -- they thought they had
2   and had some influence.
3           Q.      In your review of the factual record,
4   have you been able to identify any specific instance
5   where you believe HANJ influenced a specific
6   hemophilia patient to choose Accredo as its home
7   healthcare company?
8           A.      No.
9           Q.      As part of your work as an expert in
10  this case, did you endeavor to understand the nature
11  of the Hemophilia Insurance Purchase Program that
12  HANJ was administering from 2007 to 2012 on behalf
13  of the State of New Jersey?
14          A.      I believe I understood it.
15          Q.      What did you do to try and understand
16  the nature of that Patient Assistance Program?
17          A.      I mean I think I read the discussions
18  that were in the descriptions that were in the -- in
19  the -- in the depositions, in the documents.
20          Q.      And by the way, do you agree with the
21  characterization that the Hemophilia Insurance
22  Purchase Program was a Patient Assistance Program
23  for purposes of our discussions of OIG guidances?
24                  MS. POSERINA:    Objection to form.
25          A.      Yes, a type of Patient Assistance

Page 193

```
 1        Q.    Do you recall that the program was
 2   established pursuant to funds provided by the State
 3   Legislature?
 4        A.    Yes.
 5        Q.    And do you know that funds from the
 6   State of New Jersey continue to help support the
 7   Hemophilia Insurance Purchase Program?
 8        A.    Yes, I do.
 9        Q.    Does that in any way impact any of
10   your opinions in this case?
11        A.    No.
12        Q.    Did you look into the question of
13   whether or not the Hemophilia Insurance Purchase
14   Program in New Jersey was designed to be available
15   to individuals who were receiving federal health
16   benefits?
17        A.    I understood it was not available to
18   people getting federal health benefits.
19        Q.    And you agree that there's nothing in
20   the factual record to suggest that New Jersey's
21   Hemophilia Insurance Purchase Program was designed
22   to be available to federal beneficiaries; correct?
23              MS. POSERINA:  Objection to form.
24        A.    Correct.
25        Q.    On Page 7 of your expert report, you
```

```
                                                        Page 196
 1              You've identified a few specific OIG
 2   guidances on this subject.  Have you been able to
 3   identify any OIG guidance on the subject of how to
 4   structure a Patient Assistance Program that is
 5   designed not to include benefits to federal
 6   beneficiaries?
 7        A.    No.
 8        Q.    In other words, all of the OIG
 9   guidances that you're aware of and that you refer to
10   in your report exclusively concern Patient
11   Assistance Programs that are design to provide
12   assistance to federal beneficiaries; correct?
13        A.    In part, yes.
14        Q.    What do you mean when you say in
15   part?
16        A.    Well, most of those provide --
17   those -- most of the Patient Assistance Programs
18   provide to both private and federal employees I
19   mean.
20        Q.    Okay.  All of the OIG opinions or
21   guidances --
22        A.    Yeah.
23        Q.    -- that you've identified or that
24   you've referred to in your report concern the
25   evaluation of Patient Assistance Programs that
```

```
 1   include the provision of some kind of assistance to
 2   federal beneficiaries; correct?
 3        A.    Correct.
 4              VIDEO TECHNICIAN:  Excuse me,
 5         counsel.  Five minutes.
 6   BY MR. BOEHM:
 7        Q.    Do you agree that that -- strike
 8   that.
 9              Do you agree that it would be a
10   meaningful consideration for experienced healthcare
11   counsel, regulators, and industry participants in
12   considering OIG guidances that none of the OIG
13   guidances address Patient Assistance Programs
14   designed to exclude federal beneficiaries?
15              MS. POSERINA:  Objection to form.
16              THE WITNESS:  Can you just read
17         that again?  I want to be sure I get it
18         right.
19              (The following portion of the
20         record is read by the Court Reporter:
21              "QUESTION:  Do you agree that it
22         would be a meaningful consideration for
23         experienced healthcare counsel,
24         regulators, and industry participants in
25         considering OIG guidances that none of the
```

```
                                                          Page 198
 1           OIG guidances address Patient Assistance
 2           Programs designed to exclude federal
 3           beneficiaries?")
 4                THE WITNESS:  Yes.
 5   BY MR. BOEHM:
 6        Q.   And why would that be meaningful for
 7   their understanding?
 8        A.   Well, because the anti-kickback
 9   statute to the extent it's an -- it's an effective
10   system that -- that excludes federal healthcare
11   beneficiaries, then, as we discussed before, the
12   anti-kickback statute would not appear to apply.
13        Q.   In Paragraph 48 of your report you
14   indicate that there are over 30 favorable advisory
15   opinions relating to donations to Patient Assistance
16   Programs.
17             Do you see that?
18        A.   Yes.
19        Q.   What do you mean by favorable
20   advisory opinions?
21        A.   Well, a favorable advisory opinion is
22   one that finds that based on the representations
23   and -- made by the requester, that even if unlawful
24   intent were present, the OIG would not apply any of
25   its administrative sanction authorities to the -- to
```

```
 1         A.    I would have to read it if it's to --
 2   to say it says nothing about them.  I --
 3         Q.    You can look it over, but I'll
 4   specifically direct your attention to the third
 5   column on the second page.
 6               There's a bullet point --
 7         A.    Yes.
 8         Q.    -- right in the middle of that column
 9   that says, "Nothing in the Part D program" --
10         A.    Yes.
11         Q.    -- "or in any OIG laws or regulations
12   prevents pharmaceutical manufacturers or others from
13   providing assistance to uninsured patients."
14         A.    Yes.
15         Q.    Do you see that?
16         A.    Yes.
17         Q.    Do you agree with that statement?
18         A.    Yes.
19         Q.    In other words, you agree that there
20   is nothing in any OIG law or regulation that
21   prevents providing assistance through a Patient
22   Assistance Program to non-federal beneficiaries?
23         A.    Yes.
24         Q.    You indicate that in this bulletin
25   the OIG identified five key safeguards.
```

Page 261

```
 1        Q.      -- on Page 11 of your expert report.
 2        A.      Yes.
 3        Q.      You indicate here that, (as read):
 4   "HANJ's provision of data to Accredo on the use of
 5   Accredo's services by recipients of its insurance
 6   grants was contrary to OIG guidance and carried
 7   substantial risk under the anti-kickback statute."
 8              MS. POSERINA:  I'm sorry.  Which
 9         paragraph did you say?
10              MR. BOEHM:  I might have said the
11         wrong one.
12              THE WITNESS:  I think you did.
13              MS. POSERINA:  I think you did.
14         That's why -- you said 62.
15              MR. BOEHM:  For the record, I -- I
16         was referring to Paragraph 63.
17              MS. POSERINA:  Okay.
18              THE WITNESS:  Yes.
19              MR. BOEHM:  You probably figured
20         that out.
21              THE WITNESS:  I did figure that
22         out.
23              MS. POSERINA:  I didn't.  Thanks.
24   BY MR. BOEHM:
25        Q.      Do you see that?
```

```
                                                           Page 262
 1          A.    Yes.
 2          Q.    And you express this opinion in spite
 3    of the fact that recipients of the benefits for this
 4    Hemophilia Insurance Purchase Program were not
 5    Federal beneficiaries; is that correct?
 6          A.    That's correct.
 7          Q.    Why is that?
 8          A.    I think that's probably badly worded,
 9    but --
10          Q.    How would you reword it sitting here
11    today?
12          A.    I, as I said, I think it was the
13    failure to -- to follow those -- those guidelines
14    would have, I think, raised concerns with healthcare
15    counsel, regulators, et cetera, even though the
16    statute wasn't necessarily implicated.
17          Q.    Okay.  So you agree that it wouldn't
18    be appropriate to say that the provision of data to
19    Accredo by HANJ for a Patient Assistance Program
20    that does not cover Federal beneficiaries, quote,
21    carried substantial risk, those are not words you
22    would use sitting here today; correct?
23          A.    That's correct.
24          Q.    And you wouldn't say that that is an
25    implication of the anti-kickback statute; correct?
```

```
                                                           Page 263
 1          A.    Correct.
 2          Q.    And is that because, again, this
 3   Patient Assistance Program didn't cover Federal
 4   beneficiaries?
 5          A.    Correct.
 6                MR. BOEHM:  Why don't we just take
 7          a quick break if we could.
 8                THE WITNESS:  Okay.
 9                MR. BOEHM:  Five, ten minutes.
10                THE VIDEO TECHNICIAN:  The time is
11          5:01.  We're going off the record.
12                (A recess is held from 5:02 p.m. to
13          5:28 p.m.)
14                THE VIDEO TECHNICIAN:  The time is
15          5:27 p.m. and we are back on the record.
16   BY MR. BOEHM:
17          Q.    Mr. McAnaney, during the break you
18   indicated to me that there was something additional
19   about your substantive communications with
20   Ms. Poserina about your deposition testimony today
21   that you had not remembered when I first asked you
22   these questions, and that you wanted to now put on
23   the record; is that right?
24          A.    That's correct.
25          Q.    Please go ahead and do so.
```

Page 309

```
 1         Q.    Are you aware of any OIG guidance
 2   that is -- strike that.
 3               Are you aware of any OIG guidance
 4   that addresses the issue of disparagement or as you
 5   termed in earlier today "non-recommendation" in the
 6   context of the anti-kickback statute?
 7         A.    Well, I think it's a -- it's a --
 8   I -- I would characterize it as a recommendation not
 9   to use, so I -- I think in that case it's -- it's a
10   form of a recommendation.
11         Q.    Okay.  I'm asking you if you are
12   aware of any OIG guidance that specifically
13   addresses disparagement or a express recommendation
14   not to use.
15         A.    No, not that I'm aware.
16         Q.    Are you aware of any literature that
17   addresses that specific question?
18         A.    No.
19         Q.    Okay.  You're not offering any
20   opinions on the norms, standards, or practices of
21   hemophilia treatment centers; correct?
22         A.    No.  I've already answered that.
23         Q.    You're not offering any opinions in
24   this case about the manner in which hemophilia
25   treatment centers make -- discuss with patients
```