Robert M. Goodman, Esq.
GREENBAUM, ROWE, SMITH & DAVIS LLP
75 Livingston Avenue, Suite 301
Roseland, NJ 07068
(973) 535-1600
rgoodman@greenbaumlaw.com

*Of Counsel*
Enu Mainigi (*pro hac vice*)
Craig D. Singer (*pro hac vice*)
Paul E. Boehm (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
emainigi@wc.com, csinger@wc.com, pboehm@wc.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. STEVE GREENFIELD, et al., <br><br>　　　　　Relator, <br><br>v. <br><br>MEDCO HEALTH SYSTEMS, INC., ACCREDO HEALTH GROUP, INC., and HEMOPHILIA HEALTH SERVICES, INC., <br><br>　　　　　Defendants. | Civil No. 1:12-cv-00522-NLH-AMD <br><br><br>**DEFENDANTS' RESPONSE TO RELATOR'S COUNTERSTATEMENT OF DISPUTED MATERIAL FACTS** |

In Support of Defendants' Motion for Summary Judgment, Defendants submit the following Response to Relator's Counterstatement of Disputed Material Facts (filed May 6, 2016) ("Relator's CSMF") with references to supporting evidence,[1] pursuant to Local Civil Rule 56.1(a).  Any statements of fact in Relator's CSMF that are expressly or implicitly admitted or disputed herein are admitted or disputed solely for the purpose of Defendants' Motion for Summary Judgment.  Defendants reserve the right to contest any fact in Relator's CSMF at any time, and for any purpose other than Defendants' Motion for Summary Judgment, including, without limitation, at trial.

## RECURRING ISSUES

Relator's CSMF reflects the same deficiencies that were present in Relator's Statement of Material Facts in Support of Relator's Motion for Summary Judgment, (Dkt. No. 127-1).  Defendants incorporate herein by reference their response to those recurring deficiencies as set forth in Defendants' Response to Relator's Statement of

---

[1] Exhibits to Relator's Statement of Material Facts (Dkt. Nos. 127-2–127-27), which are numbered sequentially as Exhibits 1 to 174, and exhibits to Relator's CSMF and Relator's Objections, Answers and Counterstatement of Facts in Response to Defendants' Statement of Material Facts in Support of Motion for Summary Judgment, (Dkt. No. 129-6–129-10), which are numbered sequentially as Exhibits 175 to 213, and are cited herein as "Rel.'s Ex. ##."  Exhibits to the Declaration of Craig D. Singer in Support of Defendants' Motion for Summary Judgment (Dkt. No. 110-4), which are numbered sequentially as Exhibits 1 to 74, are cited herein as "Singer Decl. Ex. ##."  Exhibits to the Supplemental Declaration of Craig D. Singer in Support of Defendants' Response to Relator's Statement of Material Facts (Dkt. No. 131-2), which are numbered sequentially as Exhibits 75 to 87, are cited herein as "Singer Suppl. Decl. Ex. ##."

Material Facts in Support of Relator's Motion for Summary Judgment. Dkt. No. 131 at 1–7.

## SPECIFIC RESPONSES

For ease of reference, the paragraphs below are excerpted directly from Relator's CSMF, and Defendants' response follows immediately below each paragraph.[2]

1. Greenfield's Fourth Amended Complaint ("FAC") alleges that defendants Medco, Accredo, and Hemophilia Health Services (hereinafter, "Defendants", or "Accredo"), made unrestricted contributions to Hemophilia Health Services, Inc. ("HSI"). See, PSMF, ¶ 26 (Exhibit 31), 39 (Exhibit 40), 40, 41, 43 (Exhibit 43), 44 (Exhibit 44).

> **Response to Paragraph 1:** <u>Denied</u>. Paragraph 1 purports to state a fact regarding what Relator alleged in his Fourth Amended Complaint, but provides no citation to where such an allegation appears in his complaint. The record evidence cited does not indicate that Relator ever made contributions of any kind to any entity named "Hemophilia Health Services, Inc." Defendants admit that they made contributions to an entity named Hemophilia Services, Inc. The remainder of Paragraph 1 is denied as unsupported by the evidence cited.

2. HSI then gave an unrestricted grant of the funds to HANJ. Id.

> **Response to Paragraph 2:** <u>Denied in part and admitted in part</u>. Defendants admit that Hemophilia Services, Inc. provided unrestricted grants to HANJ. The remainder of Paragraph 2 is denied to the extent it incorporates by reference part or all of Paragraph 1.

---

[2] Defendants have set forth the text of the relevant Paragraph in Relator's CSMF as written. Therefore, any typographical errors that appear in the text of Relator's CSMF will also appear in the Paragraphs as set forth prior to Defendant's Specific Response.

2

3. Accredo gave contributions to HSI, to fund HANJ programs, including but not limited to the HTC grants and the insurance program. See, FAC, Doc. No. 52, at ¶¶ 6, 7, 26, 61, 70- 73, 104, 106. The evidence proves Accredo gave contributions to HSI, to fund HANJ programs, including but not limited to the HTC grants and the insurance program. PSMF, ¶ 26 (Exhibit 31), 39 (Exhibit 40), 40, 41, 43 (Exhibit 43), 44 (Exhibit 44).

>   **Response to Paragraph 3:**  <u>Denied in part and admitted in part</u>. Defendants admit that Accredo made contributions to HSI for the purpose of funding the HANJ insurance program. The remainder of Paragraph 3 is denied as unsupported by the evidence cited. None of the evidence cited demonstrates that Accredo understood or intended that HANJ would use funds contributed by Accredo to fund HTCs.

4. Accredo understood that its contributions went to support HANJ, and that HANJ supported both the HTCs and the insurance program. Accredo was aware that HANJ provided grant funding to HTCs that enabled those HTCs to continue operating. See, Exhibit 189: Accredo 30(b)(6) deposition, p. 65: 7-13 ["So besides Accredo supporting the uninsured fund, as did other providers provide funding to HSI, there was also funding for manufacturers and others for HSI to provide grants to the HTCs."]; see, Exhibit 190, Mears Depo, p.144: 6-9 [(the reasons for Bostick's reference to 340B programs because) she was doing her job to talk about, you know, all the things they do there for the patients and **treatment centers** and the State of New Jersey."] [emphasis added]; See, Exhibit 191, Kiesel Depo., p. 21:10-22: 12 [HANJ gave monies for the insurance program and to HTCs, but she does not know much about the HTC grants]; See, Exhibit 192, Bostick Deposition, p. 105:9-106:6

>   ["Q: And where would you get the money to give the HTCs these grants? A. From the HANJ program.
>   Q. The same pot of money that the corporations donated to?
>   A. Absolutely.
>   Q. And so the -- the money coming in from corporations –
>   A. From special events, from, you know, individual donors, from dues. All of it went into the provision of -- of those services, insurance and keeping the treatment center doors open, yeah.
>   Q. Okay. So the big pot of money coming in from all of those sources, dues, the
>   corporations --
>   A: Yeah.

Q. -- like Accredo and the pharma companies, the special events, that went to pay, in part, for the insurance premiums we talked about?
A. Yes.
Q. It went in part to keep the HTCs' doors open through grants?
A. Yes.]

See, Exhibit 210, Griffin Declaration, ¶ 3 [Accredo's contributions were not exclusively used to fund the insurance program]. See, also, Exhibits 105, 106 and 107.

> **Response to Paragraph 4:** <u>Denied in part and admitted in part</u>. Defendants admit that Accredo made contributions to HSI for the purpose of funding the HANJ insurance program. Defendants also admit that Accredo understood that HANJ supported the insurance program and HTCs. The remainder of Paragraph 4 is denied as unsupported by the evidence cited. None of the evidence cited demonstrates that Accredo understood or intended that HANJ would use funds contributed by Accredo to fund HTCs.

5. Accredo changed its Grant Application, beginning in 2012. This post-2011 application now required applicants to provide additional information, including the applicants' intended use of funds. This new application also required the applicant to certify its uses of funds, and that it would not designate any funding only for Accredo customers. This language did not exist in the pre-2012 applications. See, Exhibit 185.

> **Response to Paragraph 5:** <u>Denied in part and admitted in part</u>. Defendants admit that in 2011, the Funding Application required charitable organizations to provide information regarding how they would use funds and to agree that funds would not be used in any way that would discriminate in favor of Accredo customers. The remainder of Paragraph 5 is denied as unsupported by the evidence cited.

6. Karen Griffin notified Accredo executives, including Craig Mears, Ken Bodmar, and others, that the Accredo-HANJ relationship of contributions in exchange for referrals was illegal. See, Griffin Declaration, attached hereto as Exhibit 213.

> **Response to Paragraph 6:** <u>Denied</u>. Griffin did not testify at her deposition that she expressed the opinion to Accredo executives that the

4

contributions were illegal. Mears and Bodmer were never notified by Griffin that she believed Accredo's contributions to HANJ to be illegal. Singer Decl. Ex. 33 (Declaration of Craig Mears ¶ 12); Singer 2d Suppl. Decl. Ex. 97 (Bodmer Dep. 52:19–53:7; 55:19–23; 65:6–18). Griffin's deposition testimony establishes that to the extent she believed there was a deal between Mears and Bostick of contributions in exchange for referrals, it related specifically to the retention and recruitment of patients whose private insurance premiums were paid by the HANJ insurance program. *See* Response to Paragraph 26(d), *infra*.

7. Greenfield Expert Kevin McAnaney opines, and testified, that contributions in exchange for recommendations violate the AKS, regardless of the use HANJ made of the monies. See, Exhibit 209, McAnaney Depo, at p. 80:12-81:23 [the contribution is only the money; it doesn't affect the underlying problem with the arrangement. How HANJ uses the money is not as important as the way they've solicited it.]; 87:18-88:25 [ "what is significant is how the funds were obtained and what was the basis of those funds being obtained, not how they're used. Because the solicitation was based on a general recommendation to members that included Federal healthcare beneficiaries."].

> **Response to Paragraph 7:** <u>Denied</u> as argumentative. Local Rule 56.1 expressly prohibits parties from incorporating "legal argument or conclusions of law" into the statements of material fact. L. R. Civ. P. 56.1. While no further response is required, Accredo further denies that it made "contributions in exchange for recommendations."

8. Hemophilia patients in New Jersey have insurance coverage through Medicare and Tricare. In New Jersey, there are twenty four hemophilia patients who are Federal beneficiaries. See, Report of Gibson, at Exhibit 4.

> **Response to Paragraph 8:** <u>Admitted</u> that some, but not all, hemophilia patients in New Jersey have insurance coverage through Medicare or TriCare, that Greenfield's expert Palentchar purported to identify 27 patients, and that Defendants' expert Gibson agreed that 24 of these in fact had insurance coverage through Medicare or TriCare.

9. Defense expert Gibson obtained the Accredo data, in the format as it was submitted to Federal payors, including Medicare and Tricare. Accredo's in-house

5

accounting program was called RxHome, and recorded the submissions of claims for payment made by Accredo to Medicare and Tricare. See, Exhibit 212, Deposition of Amanda Bundy, at 70:2-72:15.

> **Response to Paragraph 9:** Denied as unsupported by the evidence cited. The evidence cited does not reference Defendants' expert Wayne Gibson, what information he obtained, or how he obtained it.

10. In support of this, Mr. Gibson noted in his report that,

> As part of my review, I was provided data from Accredo's RxHome system related to invoicing, shipments and patient demographics associated with their New Jersey-based hemophilia patients. It is my understanding that this is the same information that was produced to plaintiffs, a subset of which is contained in the exhibits attached to Mr. Palentchar's report.
>
> The RxHome data was provided to me in two formats containing identical information: (a) individual text files, and (b) a separate access database containing a number of tables. As further described in my background in Exhibit 1, a significant portion of my experience involves working with data sets in formats similar to those produced.

Gibson, Exhibit 4, at ¶ 4-5.

> **Response to Paragraph 10:** Admitted that the language Relator quotes in Paragraph 10 appears in the document cited.

11. Mr. Gibson also noted in his report that

> Using the CONFIDENTIAL HEALTH INFORMATION_ACC0036451.xlsx file [culled from RxHome], I reviewed the *Payer Reporting Group* values associated with each of the 27 individuals listed in Exhibit 1. From my review, I was able to identify that 20 individuals appeared in the file with a *Payer Reporting Group* of "Medicare", four individuals appeared in the file with a *Payer Reporting Group* of "Fed BC/BS"1, and three individuals appeared in the file with a *Payer Reporting Group* of "Tricare".

Gibson, Exhibit 4, at ¶ 14.

> **Response to Paragraph 11:** Admitted.

12. Mr. Gibson further noted that "[w]ithin the CONFIDENTIAL HEALTH INFORMATION_ACC0036451.xlsx file [culled from RxHome] there existed additional fields that provided information regarding the payer. In addition to the *Payer Reporting Group,* I reviewed the *Payer Group* field to better categorize the 27 individuals [initially identified as having Federal payors]." Gibson, Exhibit 4, at ¶ 16.

> **Response to Paragraph 12:** Admitted.

13. Three of the identified patients were Tricare patients. See, Gibson Report, Exhibit 4, at Schedule 1.

> **Response to Paragraph 13:** Admitted.

14. Accredo submitted invoices, or claims for payment, and were paid for, care related to Medicare and Tricare patients. Id., at Schedule 3a.

> **Response to Paragraph 14:** Admitted.

15. In its Motion for Summary Judgment, and during discovery, Defendants produced its Provider Agreements with CMS. See, Defendants' Exhibits 60 to 70.

> **Response to Paragraph 15:** Admitted.

16. Each of these Provider Agreements requires compliance with all Medicare statute and regulations, including compliance with the AntiKickback Statute. See, Defendants' Exhibits 60 to 70; see, FAC, ¶ 109.

> **Response to Paragraph 16:** Denied in part, admitted in part. Denied to the extent that relator does not cite record evidence containing the actual language requiring compliance with all Medicare statutes and regulations, including compliance with the AKS. The copies of the signed Forms 855S for the relevant time period, as maintained in

7

Accredo's files, do not contain the pages that would have included that language. Singer Decl. Exs. 60–70. Accredo assumes, for purposes of this motion, that Accredo certified to the language quoted at ¶ 109 of the Fourth Amended Complaint and quoted by this Court in its prior opinion. *See* Defendants' Brief in Support of Motion for Summary Judgment (Dkt No. 110-2) at 32 & n.11.

17. Provider Agreements contain the Certification language cited in the FAC, ¶ 109. See, Defendants' Answer to FAC, Doc. No. 56, ¶109 [ "The remainder of Paragraph 109 of the FAC purports to quote from, characterize, or describe documents, which documents are the best record of their contents."]

> **Response to Paragraph 17:** <u>Denied</u> as unsupported by the evidence cited. Relator cites only to Defendants' Answer, which does not support Paragraph 17.

18. The documents themselves, are attached hereto as Exhibits 205 (CMS 855S, from 4/2006); 206 (CMS 855S, from 2/2008); and 207 (CMS 855 S from 3/2009, effective 7/09).

> **Response to Paragraph 18:** <u>Denied in part, admitted in part</u>. Denied as unsupported by the evidence cited to the extent that Paragraph 18 posits that Exhibits 205–207 are the "documents themselves" that constitute Accredo's own Provider Agreements with CMS. Admitted insofar as Accredo does not dispute Relator's counsel's representation that "documents obtained from the public record as exhibits . . . are true and correct copies of the approved forms published by the Centers for Medicare and Medicaid Services (CMS) [and that] such documents [] were obtained from reliable public sources and such forms are otherwise identified as OMB Approved Form 0938-0685 (Exhibits 205 and 206) and OMB Approved Form 0938–1057 (Exhibit 20[7])." Certification of Regina D. Poserina (June 6, 2016) ¶ 7.

19. At Section 15, each of these documents state:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that

8

> payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal antikickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

Id.

> **Response to Paragraph 19:** <u>Denied in part, admitted in part</u>. Denied as unsupported by the evidence cited to the extent that Paragraph 19 posits that Exhibits 205–207 are the "documents themselves" that constitute Accredo's own Provider Agreements with CMS. Admitted insofar as Accredo does not dispute that Exhibits 205–207 contain the quoted language.

20. At page 32-33 of its Brief, Defendants cite to this Court's Opinion, at p. 25. That citation is taken out of context. The actual citation in the Opinion finds that the abundance of caselaw that permits the use of enrollment forms such as Form 855s to serve as the basis for a legally false certification claim under the FCA supports the same result in this case.

> **Response to Paragraph 20:** <u>Denied</u> as unsupported by any citation to the evidence in the record, as argumentative, and as mischaracterizing the Court's Opinion.

21. Elena Bostick always referred to the contributions made by Accredo and other homecare companies as "fees for services." The term "services," as Bostick used it when referring to "fees for services," included recommendations and referrals. Accredo employees were aware that Accredo's contributions bought recommendations and referrals.
    Ms. Bostick specifically stated that the "services" received by Accredo, and other HSI approved providers, included being listed as an HSI approved provider, and opening the door to communications with the HTCs. HANJ's "HSI approved provider" list, with its hyperlinks to Accredo's website, were only provided to those who gave donations. HANJ's letters listing Accredo as "recommended," were only provided to those who gave contributions. HANJ's communications to HTCs that the HTC grant money was provided by Accredo, were only provided to those who gave contributions. All of these amount to a recommendation or referral. See, PSMF, ¶ 117 to 133; Exhibits 83, 86 to 99 [ for example, Ms. Bostick

9

stated in an email that HANJ's "pledge from HHS is $500,000.00, a bargain considering they dispense 43,518,419 units in N.J. last year. If you do the math, this equals approximately $0.01148 per unit, but this is not the number we should request from everyone to pledge. HHS clams they are giving us as much as they can, and we have accepted it because it is a huge number. ***It is kind of a volume discount.***"] [Emphasis added].

Ms. Griffin states that it was "common knowledge" at Accredo that its contributions purchased recommendations and referrals.

Throughout this case the "services" Bostick had in mind when she used the phrase "fee for service" were of benefit to the entire hemophilia community, including hemophilia homecare companies, such as recommendations and referrals. This is why companies such as Accredo purchased these services, i.e., recommendations. See, e.g., Exhibit 193, audiotape of January 6, 2012, at p. 7-8 [Accredo unwilling to fund an organization that sends unfavorable messages about Accredo to its members]. See, also, Exhibits 29, 32.

> **Response to Paragraph 21:** Denied as unsupported by the evidence Relator cites and as argumentative. Accredo incorporates herein by reference Accredo's Responses to Paragraphs 117 to 133 of Relator's Statement of Material Facts, and Paragraphs 113 to 119 of Accredo's Statement of Material Facts. Relator cites no record evidence for the purported statements by Griffin.

22. Bostick regularly told HTCs that they should refer patients to one company over another. Bostick, and/or HANJ, regularly communicated with HTCs, that the source of grants to HTCs, which account for a large percentage of the HTCs operating budget, was HSI approved providers such as Accredo. This communication amounts to a recommendation. In fact, HTCs viewed it as such. And HTCs would refer patients to Accredo based upon the relationship they had with Accredo. See, Exhibit 197, Deposition of Karen Griffin, 163: 5- 164:17; Exhibit 210, Griffin Declaration, at ¶¶ 8-11.

    Ms. Bostick expected that HTCs would refer patients to entities that had donated to HANJ. Ms. Bostick specifically stated in emails that one of the "services" provided for the "fees" was enhanced "communications" between Accredo and the HTCs. Bostick also told Ms. Griffin, and Mr. Greenfield, that reduced contributions by Accredo would cause HTCs to refer less patients to Accredo. See, e.g., Ms. Griffin's Declaration, Exhibit 210, at ¶ 8 (page 3).

> **Response to Paragraph 22:** Denied as unsupported by the evidence Relator cites and as argumentative. Bostick specifically testified that she

10

did *not* try to influence patients' selection of home-care providers. *See* Singer Decl. Ex. 8 (Bostick Dep. at 86:14–86:25). Griffin's declaration is inadmissible to support this assertion because it does not offer any basis upon which Griffin had personal knowledge regarding what communications Ms. Bostick had with HTCs, or what Ms. Bostick expected of them. Fed. R. Evid. 602; Fed R. Civ. P. 57(c)(2).

23. Kevin McAnaney's Expert Report contains his opinions regarding the field of Federal health care fraud and abuse. Mr. McAnaney's deposition was taken in this case. Mr. McAnaney testified that "there is ample evidence in the record that [HANJ] recommended specific providers, that they took actions to promote those providers from time to time, and that, in fact, people did switch in relation to -- based in part on those -- on their activities, on HANJ's activities." See Exhibit 201, McAnaney Depo., 124:24-125: 6.

   Mr. McAnaney testified that HANJ gave recommendations because "They [HANJ] have a list during this relevant period. They had a list of HSI approved healthcare -- home care providers I believe they were, and they disseminated that information. It was on their website. It was fairly -- I mean it got wide distribution among their membership. Id, at p. 134:15-25.

   Mr. McAnaney also testified that the fact that HANJ recommended Bio Script is evidence that HANJ gave recommendations to its members. See, McAnaney Depo., 135:3- 136:19.

>  **Response to Paragraph 23:**  <u>Denied in part, admitted in part</u>. Defendants admit that McAnaney provided a report and testimony in this matter, and that Paragraph 23 accurately quotes his testimony. The substance of Paragraph 23 is denied.

24. Mr. Mears claims, in the Declaration attached as Exhibit 33 to Defendants' Motion for Summary Judgment, that his knowledge about HANJ's use of funds was limited, that he was not aware of HANJ funds assisting Federal beneficiaries, that he was not aware of Accredo's contributions being connected to referrals; and that no one ever told him about the legality of the HANJ contributions.

>  **Response to Paragraph 24:**  <u>Denied in part, admitted in part</u>. Defendants admit that Mears stated the following in his declaration: "Ms. Bostick represented to me that patients who were covered by federal healthcare programs such as Medicare were ineligible to receive benefits through the HANJ insurance program"; "No one at HANJ,

11

> HSI, or any HTC ever told me that referrals of hemophilia patients would be influenced by whether Accredo contributed to HANJ or HSI, or by the amount of those contributions. No one else at Accredo ever told me that HANJ, HSI, or any HTC had made any such communication to them either"; and "I believed, and continue to believe, that Accredo's contributions to HANJ and HSI were legal. No one else at Accredo ever told me that they believed otherwise." Singer Decl. Ex. 33 ¶¶ 4, 9, 12. The remainder of Paragraph 24 is denied as unsupported by the evidence cited.

25. Karen Griffin reported directly to Craig Mears during her tenure as a vice president at Accredo. See, Exhibit 211.

    **Response to Paragraph 25:** Admitted.

26. In her Declaration, Ms. Griffin states that
    (a) everyone at Accredo knew that HANJ used its donations for multiple purposes, not just the insurance program;
    (b) Accredo played no role in how HANJ allocated its contributions;
    (c) Accredo was interested in all HANJ patients, Federal beneficiaries or private pays, because they all created income for Accredo;
    (d) Accredo had a tacit understanding with HANJ, that its contributions would ensure the retention of current patients and the recruitment of future patients;
    (e) patients without insurance would have access to healthcare, through either the HTCs or the manufacturers;
    (f) Mr. Mears recommended increased funding to HANJ because HANJ was highly influential among hemophilia patients in New Jersey.
    (g) Accredo realistically believed that, if it failed to support HANJ, it would lose recommendations and patients;
    (h) It was common knowledge at Accredo that its relationship with HANJ was one of contributions in exchange for referrals;
    (i) Ms. Griffin told Mr. Mears that Elena Bostick of HANJ, stated that referrals and recommendations of patients to Accredo were influenced by the contributions made to HANJ;
    (j) it was common knowledge at Accredo that Accredo did not have to ask for recommendations. If Accredo paid its contributions, HANJ's recommendations of Accredo's services would naturally flow; and
    (k) it was pointed out to Craig Mears regularly, in Ms. Griffin's presence, that the Accredo - HANJ relationship could be illegal.

**Response to Paragraph 26:** Denied in part, admitted in part. Relator cites no record evidence for the purported statements by Griffin. To the extent Relator intended to refer to Relator's Exhibit 211, and intended Paragraph 26 to make any factual assertions beyond stating the contents of Relator's Exhibit 211, Defendants respond to the specific subparts of Paragraph 26 as follows:

(a) Denied. Griffin's declaration is inadmissible to support this assertion because it does not offer any basis upon which Griffin had personal knowledge as to what "everyone at Accredo knew." Fed. R. Evid. 602; Fed R. Civ. P. 57(c)(2). As to what Griffin herself believed, Griffin's deposition testimony establishes that her understanding was that Defendants' contributions went to support the HANJ insurance program. Singer 2d Suppl. Decl. Ex. 95 (Griffin Dep. 84:17–18) ("HANJ received a great deal of money from Medco to buy these insurance policies."). In neither her declaration nor her deposition testimony did Griffin state that she believed (or that anyone else at Accredo told her that they believed) that HANJ would use funds contributed by Accredo to support HTCs. Griffin's deposition testimony establishes that she lacked personal knowledge on this issue. *See* Singer 2d Suppl. Decl. Ex. 95 (Griffin Dep. 180:1–16) ("Q. Does that sentence refresh your memory in any way about the fact that HANJ may have awarded grants to HTCs? A. I do vaguely remember that they do that or that they did that. ***I don't remember having any dialogue about that, though, with Elena or anyone else.*** Q. Do you remember having any dialogue about that particular issue in the executive committee meetings? A. No. ***The big concern about the HTCs was the 340-B threat. So that was not – these grants were not discussed necessarily.***") (emphases added, objection by counsel omitted).

(b) Admitted, to the extent "played no role in how HANJ allocated its contributions" refers to playing no role in HANJ's decision-making process as to such allocations.

(c) Denied. Griffin's declaration is inadmissible to support this assertion because it does not offer any basis upon which Griffin had personal knowledge as to what "Accredo was interested in," whatever that means. Fed. R. Evid. 602; Fed R. Civ. P. 57(c)(2). Furthermore, Griffin's declaration does not actually state that "Accredo was interested in all

13

HANJ patients, Federal beneficiaries or private pays, because they all created income for Accredo."

(d) Denied. Griffin's declaration is inadmissible to support this assertion because it does not offer any basis upon which Griffin had personal knowledge as to whether "Accredo had a tacit understanding with HANJ" or as to what any such understanding encompassed. Fed. R. Evid. 602; Fed R. Civ. P. 57(c)(2). As to what Griffin herself believed, Griffin's deposition testimony establishes that she believed there existed a deal between Mears and Bostick that related specifically to the retention and recruitment of **patients whose private insurance premiums were paid by the HANJ insurance program**. Griffin explained that the "handshake deal" she understood Mears and Bostick to have was premised on the fact that as to the "patients receiving their insurance for free, . . . it was understood that if we took from a patient a paid insurance policy, which was at least for them, for the patient and their experience, seamlessly providing hemophiliac factor into their child's life or their life or whatever, and that was threatened and that would go away because of some action on the part of Medco, they would no longer choose our service." Singer 2d Suppl. Decl. Ex. 95 (Griffin Dep. 179:4–17). Regarding Bostick's reference to the fact that 59 of the 77 HANJ insurance grant recipients were Accredo patients, Griffin testified that these were the patients that she understood to be the "return on investment" that Accredo received for its contributions, and that "when the money began to be decreased [by Accredo]," HANJ "threaten[ed] Mears with the reduction of these 59 patients if the money went away." *Id.* at 174:25–176:12. She explained that she considered HANJ to have "quite a hold" on the patients whose private insurance premiums were paid by HANJ, *id.* at 168:5–169:13, and that by contrast HANJ "had no hold" over other patients (including federal beneficiaries) who did not need to rely on the HANJ insurance program.

(e) Denied. Griffin's declaration is inadmissible to support this assertion because it does not offer any basis upon which Griffin had personal knowledge as to whether some or all "patients without insurance" would actually have been able to obtain free healthcare through HTCs or the manufacturers. Fed. R. Evid. 602; Fed R. Civ. P. 57(c)(2). As to what Griffin herself believed, Griffin's deposition testimony establishes that she believed the HANJ insurance program provided healthcare benefits via private insurance to patients who otherwise would not have had healthcare benefits. This was the basis for Griffin's speculation that

14

HANJ "had quite a hold over the patients" whose insurance premiums it paid. Singer 2d Suppl. Decl. Ex. 95 (Griffin Dep. 169:12–13). Griffin testified that "[t]he patients certainly benefited from [the policies purchased by HANJ," *id.* at 84:18–19, and that her "main concern was that the patients not be left without insurance," which she was "less concerned" about because Bostick had told her "other companies would step in to pay the fees for those insurance policies" if Medco reduced its contributions, *id.* at 84:16–25.

(f) Denied. Griffin's declaration is inadmissible to support this assertion because it does not offer any basis upon which Griffin had personal knowledge as to the "purpose for Mr. Mears recommending an increase in HANJ funding." Fed. R. Evid. 602; Fed R. Civ. P. 57(c)(2). Nor does Griffin's statement specify what "increase in HANJ funding" she is referring to. With respect to Mears's recommendation to Accredo's senior leadership that Accredo commit to contributing $350,000 to HSI in 2012, Mears's reasons for doing so are described in his declaration, Singer Decl. Ex. 33 (Declaration of Craig Mears at ¶ 7–8), and in contemporaneous documents, Singer Decl. Ex. 42 (ACC0006136, 5/2/2011 Email from Mears to Sheehy and Scott); these reasons included enhancing goodwill toward Accredo, concern regarding the impact that a failure of the HANJ insurance program would have on Accredo patients who relied upon it, and the risk that HANJ would fund the insurance program by defunding its grants to New Jersey HTCs. *Id.* Mears's reasons did <u>not</u> include any purported "HANJ . . . influenc[e] among hemophilia patients in New Jersey." *Id.* Furthermore, Griffin's deposition testimony establishes that to the extent she believed HANJ could influence patients' choice of providers, that influence extended only to patients whose private insurance premiums were paid by the HANJ insurance program. *See* Response to Paragraph 26(d).

(g) Denied. Griffin's declaration is inadmissible to support this assertion because it does not offer any basis upon which Griffin had personal knowledge as to what "Accredo realistically believed" would occur "if it failed to support HANJ." Fed. R. Evid. 602; Fed. R. Civ. P. 57(c)(2). As to what Griffin herself believed, Griffin testified at her deposition that she had no idea whether HANJ could actually persuade patients to leave Accredo's service. *See* Singer 2d Suppl. Decl. Ex. 95 (Griffin Dep. 83:10–18) ("Q. **Do you know of any phone calls that Ms. Bostick made as a result of the meeting she had with you? A. I'm not**

15

*aware. Ms. Bostick did not follow up with me to inventory her actions after our meeting. Q. And you didn't hear about it through some other means? A. I didn't.*" (emphasis added)); *id.* at 176:6–11 ("I mean, at least the way I'm perceiving this latter, that's why she's saying. She's saying if the money does not keep coming, there 59 patients will soon be on someone else's service. **Whether or not she actually had the ability to make that happen, I can't say.**" (emphasis added)). Furthermore, Griffin's deposition testimony establishes that the Accredo patients she believed might choose another provider if Accredo reduced contributions were those whose private insurance policies were paid for by HANJ. *See* Response to Paragraph 26(d), *supra*.

(h) Denied. Griffin's declaration is inadmissible to support this assertion because it does not offer any basis upon which Griffin had personal knowledge of any "common knowledge at Accredo that its relationship with HANJ was one of contributions in exchange for referrals." Fed. R. Evid. 602; Fed R. Civ. P. 57(c)(2). As to what Griffin herself believed, Griffin's deposition testimony establishes that to the extent she believed there was a deal between Mears and Bostick of contributions in exchange for referrals, it related specifically to the retention and recruitment of patients whose private insurance premiums were paid by the HANJ insurance program. *See* Response to Paragraph 26(d), *supra*.

(i) Denied. Mr. Mears was never told that referrals of hemophilia patients would be influenced by whether Accredo contributed to HANJ or HSI, or by the amount of those contributions. *See* Singer Decl. Ex. 33 (Declaration of Craig Mears ¶ 9). Furthermore, Griffin's deposition testimony establishes that to the extent she believed there was a deal between Mears and Bostick of contributions in exchange for referrals and recommendations, it related specifically to the retention and recruitment of patients whose private insurance premiums were paid by the HANJ insurance program. *See* Response to Paragraph 26(d), *supra*.

(j) Denied. Griffin's declaration is inadmissible to support this assertion because it does not offer any basis upon which Griffin had personal knowledge of any "common knowledge at Accredo that Accredo did not have to ask for recommendations [and that] If Accredo paid its contributions, HANJ's recommendations of Accredo's services would naturally flow." Fed. R. Evid. 602; Fed R. Civ. P. 57(c)(2). As to what Griffin herself believed, Griffin's deposition testimony establishes that to the extent she believed there was a deal between Mears and Bostick of

16

contributions in exchange for recommendations, it related specifically to the retention and recruitment of patients whose private insurance premiums were paid by the HANJ insurance program. *See* Response to Paragraph 26(d).

(k) Denied. Griffin's declaration fails to identify anyone besides Griffin herself who ever raised with Mr. Mears the purported "questionable legality" of "the HANJ relationship." Rel.'s Ex. 211 ¶ 12. There is no record evidence of anyone ever making such a statement to Mr. Mears. Griffin's deposition testimony establishes that to the extent she believed there was a "HANJ relationship" of contributions in exchange for recommendations, it related specifically to the retention and recruitment of patients whose private insurance premiums were paid by the HANJ insurance program. *See* Response to Paragraph 26(d).

27. Most of the home care companies in New Jersey – speciality pharmacies that also provide home assistance to its customers– provide employees who are a resource to patients. See, e.g., website of BDRN [Bleeding Disorders Resource Network] Specialty Pharmacy, http://www.mybdrn.com/service/patient-care-services/ ["BDRN delivers quality, patient centered care to clients and healthcare practitioners alike. Our commitment to excellent customer service backed by total case management that focuses on the whole patient, makes us the right choice for your specialty pharmacy services and bleeding disorder treatment needs."]

    Hemophilia treatment centers also provide employees who are resources to patients. See, e.g., http://www.barnabashealth.org/Childrens-Hospital-of-New-Jersey-NBI- /Our-Services/Cancer-Oncology/Hemophilia-Treatment-Center.aspx ["The Center offers complete evaluations by a team of experts including hematologists, nurses, psychosocial professionals and physical therapists... Our Center's goal is to provide the latest advances in treatment for people with hemophilia, assist in the care of the complications of hemophilia, and continue to provide support to persons with hemophilia and their families with the goal of achieving a normal lifestyle....We also coordinate a home care program which enables persons with hemophilia to lead normal, productive lives."]

> **Response to Paragraph 27:** <u>Denied in part and admitted in part</u>. Defendants admit that the language Relator puts in quotation marks in Paragraph 27 appears on the websites cited. The remainder of Paragraph 27 is denied as argumentative.

28. Patient Services Inc., is a non-profit that administers funds to provide support to patients, and their families, suffering from chronic, expensive illnesses and conditions. HANJ only provides services to hemophilia patients, and provides services other than insurance assistance. PSI's only mission is to provide economic assistance to people with expensive chronic illnesses and conditions, nationwide. See, e.g., http://www.patientservicesinc.org/; ["Mission Statement: PSI is a national non-profit organization whose caring staff is committed to supporting people with expensive chronic illnesses and conditions through locating solutions with health insurance and assisting with premiums and prescription copayments to facilitate positive health and well-being."] PSI publishes on its website, an annual report, so that donors can review its spending and fund raising, and see the types of patients served by PSI. See, Http://www.patientservicesinc.org/Who-We-Are/Annual-Report .

   PSI also has hyperlinks to its financial statements and IRS filings on its website. http://www.patientservicesinc.org/Who-We-Are/Financials

   PSI does not list its donors on its website, but instead lists them in its annual reports.

>   **Response to Paragraph 28:** <u>Denied in part and admitted in part</u>. Defendants admit that the language Relator puts in quotation marks in Paragraph 28 appears on the websites cited. Paragraph 28's statements regarding PSI are admitted. The remainder of Paragraph 28 is denied as argumentative.

29. The process of establishing a 340B at an HTC is complex, takes years to develop, and was unlikely to occur at the New Jersey HTCs. In her deposition, Ms. Griffin stated that the process of setting up a 340B program is extremely complex. See, Exhibit 188, Griffin Depo, at p. 85:7-24. Ms. Griffin stated that it was unlikely that the New Jersey HTCs could become 340Bs, because it is a complicated process that would take between 8 and 20 years. Exhibit 188, Griffin Depo, at p. 87:12-88: 17.

   Ms. Griffin stated that Accredo employees, like Amy Macbeth, did not understand what a 340B was, or how it might impact Accredo. Ms. Griffin noted that Accredo, despite having to deal with a New York state consortium , had "on the eve of my termination, we had brokered an $800 million deal with that New York consortium to take over their anti-hemophiliac factor supply.... So we actually stood to greatly benefit. So this is just all muddled nonsense is what this is." Griffin, 95: 7 to p. 99:4.

   Ms. Griffin acknowledged that 340B's, if they were to become present in New Jersey, could decrease Accredo's business. "There was a committee, a 340-B

18

committee. I was on it; Mike Hess was on it. We were trying to figure out how to stop that train or find a way to play to get involved in that market." Griffin Depo, p. 99: 9-25.

>**Response to Paragraph 29:** <u>Denied in part and admitted in part</u>. Defendants admit that the language Relator puts in quotation marks in Paragraph 29 appears on the websites and deposition transcripts cited. The remainder of Paragraph 29 is denied as argumentative.